UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | |
| vs. | ) | 1:06-CR-21 |
| | ) | COLLIER/CARTER |
| | ) | |
| DAVID SIMPSON | ) | |

<u>REPORT AND RECOMMENDATION</u>

I. Introduction

Defendant David Simpson's Motion to Suppress (Doc. 23) is before the undersigned having been referred by the District Court for a report and recommendation pursuant to 28 U.S.C.§ 636(b)(1)(B)&(C). The sole issue in this motion is whether sufficient legal justification existed under the Fourth Amendment of the United States Constitution for the police officer to stop the defendant's vehicle as it traveled down I-75. For the reasons stated herein, it is RECOMMENDED that defendant's motion to suppress be DENIED.

II. Relevant Facts

An evidentiary hearing was held before the undersigned Magistrate Judge on Wednesday, July 26, 2006. Officer Andy Ratcliff and Police Chief Wes Snyder testified for the government; private investigator Marc Lawrence, video expert Barry Cammon, and defendant David Simpson testified for the defense.

*Officer Andy Ratcliff*

Officer Andy Ratcliff of the Cleveland Police Department testified to the following: he has been with the Cleveland Police Department since 1998 and is a K-9 handler. He normally

1

works the I-75 corridor. On February 21, 2006, at approximately 8:00 pm, he was monitoring the northbound traffic at the 23-mile marker in his patrol car which was parked in a gravel area within the median of the interstate. He observed a black Nissan Maxima pass and noticed an especially dark tint on the windows and a temporary plate which didn't appear to be clearly visible. The officer used his headlights and spotlight to enable him to make these visual observations. He then pulled out of the median and caught up with the Maxima beyond the 25-mile marker. He was approximately a car length distance from the Maxima when he could more clearly observe the temporary tag. The tag appeared beaten, weathered and was flapping as the vehicle traveled down the highway, and he could not read the expiration date on the tag. Based on the condition of the tag, he thought it might be expired or did not belong on the car. He decided to detain the vehicle and turned on his blue lights which automatically activated a dash camera in the patrol car and a body microphone Officer Ratcliff was wearing. The video tape of the stop indicates that stop occurred at 8:10 pm. Officer Ratcliff stopped his patrol car on the shoulder approximately a car length behind defendant. He had another officer, Mike Kelly, in his patrol car with him. The video tape shows Officer Ratcliff exit his vehicle, walk to the back of the Maxima, and shine a flashlight on the back tag to examine it. He saw the expiration date of February 22, 2006. He then walked to the front passenger side of the Maxima. When Ratcliff approached the vehicle, the passenger, a woman, rolled the window down, and Ratcliff immediately smelled marijuana, both raw and burnt, coming from the car. The video shows Ratcliff motioning with his hand on top of the Maxima's hood toward the camera. Ratcliff explained he was motioning for his partner to exit the patrol car because he smelled marijuana and did not think this would be a typical traffic stop. He asked the defendant for his driver's

license and registration, and the defendant asked, "Did my tag fall off?" At 8:13 pm, the defendant, who had been driving, exited the vehicle at Ratcliff's request. The video shows them talking at the rear of the vehicle and looking at the tag. Ratcliff testified that the defendant stated he stopped at a gas station to put tape on the tag and secure it. Ratcliff then left the defendant standing at the back of the car and went to speak to the woman in the passenger's seat. He asked her about the marijuana, and she said they had smoked marijuana in the car in Atlanta but that they didn't have any with them. Ratcliff returned to the defendant behind the Maxima and asked him about the marijuana. The defendant denied smoking anything and stated he had no marijuana. Officer Ratcliff asked for permission to search the vehicle and the defendant declined to give consent. Ratcliff decided to run his dog around the car and the canine alerted. He then searched the vehicle and found three kilos of cocaine in the vehicle.

Ratcliff further testified that after the Maxima was initially pulled over, Officer Kelly contacted dispatch to inform it about the stop. A copy of the radio traffic indicates Officer Kelly stated, "Black 99 Maxima no tag." Ratcliff made a background check with the Blue Lightning Operation Center (BLOC) after the stop was completed. He testified he was not able to run a check on the temporary tag because temporary tags are not entered into a national database to check ownership of car and registration. He needed to obtain the driver's license, vehicle registration, and car VIN number before he could run a check.

The video from Officer Ratcliff's dash camera cast a large white glare on the tag making it difficult to discern anything about the tag from the videotape. The government, however, introduced into evidence pictures taken of the temporary tag immediately after the defendant's arrest when the car was impounded and towed to the police impound lot. One picture was taken

3

without a flash (Gov. Ex. 1) and one picture was taken with a flash (Gov. Ex. 2). The photos show a one to two inch off-white margin around the sides of a cardboard tag. (Gov. Ex. 1 & 2). The license number K780854 and the expiration date of "Feb 22 06" are displayed on the tag on a slightly whiter surface than the outer margins of the tag and appear to be covered with a clear plastic tape or a thin clear laminate. The license number is printed in large, bold, black letters which are clearly visible, but the expiration date is handwritten in what appears to be thin, faded black marker and it is difficult to read. *Id.* Duct tape on the bottom right and left corners hold the bottom of the tag to the car. *Id.* The tape or laminate covering the license number and expiration date is bubbled and wavy. *Id.*

Following presentation of the defendant's evidence, Officer Ratcliff testified again on rebuttal. The temporary tag is made of cardboard with a smaller sized sticker bearing the license number and expiration date affixed to the cardboard tag. The flapping he saw of the tag occurred within the left corner of the inner sticker portion of tag. He opines the sticker was coming off the cardboard and that is what he saw flapping.

*Wes Snyder*

Wes Snyder, Chief of Police for the City of Cleveland, Tennessee, testified to the following: while there have been in the past written standard operating procedures concerning traffic stops, those have since been rescinded. There are no written policies on making traffic stops because each situation is unique and the officer must rely on his own judgment when initiating and carrying out a traffic stop. There were no traffic stop policies in effect on February 21, 2006.

*Marc Lawrence*

Marc Lawrence, witness for the defendant, testified to the following: he has been an investigator with Professional Legal Investigations for three years. On March 10, 2006, he went to the Cleveland Police Department impound lot to see the car the defendant had been driving on February 21, 2006. He met Trey Aycock, another investigator, at the impound lot. A woman from the Cleveland Police Department, an evidence custodian, was present with them at the lot. Nothing was done to alter the view of the tag. The wind was blowing but the tag was not moving at all. They took photographs with a digital camera of the temporary tag on the defendant's black Nissan Maxima. Some of these photographs were introduced into evidence at the hearing.

Having examined the photos taken by Mr. Lawrence (Gov. Ex. 6[1] and Def. Ex. 14 & 15), the undersigned makes the following observations: the tag is affixed to the vehicle by 2 screws at the top and duct tape on the two bottom corners. The expiration date is slightly faded and handwritten near the bottom with what appears to have been a thin, black marker. The tag is an off-white cardboard rectangle with a smaller white rectangle laid on top of and inside of the larger rectangle.[2] This smaller rectangle contains the tag number K780854 which is printed on either white paper affixed to the cardboard by wide clear tape or laminate or a sticker affixed directly to the cardboard. There is a one to two inch margin of cardboard above the sticker or paper

---

[1] The defense took this photograph of the license plate but did not move to admit it into evidence. The government did, however, and it was therefore marked as a government exhibit.

[2] This "inner rectangle" is not a true rectangle in that the bottom left and right corners have large squarish notches cut out, but these notches have no effect on the upper half of the inner rectangle. Therefore, for ease of discussion, I refer to this inner portion of the tag as the "inner rectangle."

5

where K780854 is printed. A long tear all the way across the top of the smaller rectangler is observed in the pictures. *Id.* The tear continues vertically down about 1/3 of both the upper right and upper left sides of the smaller rectangle. Bucking of the upper portion is visible across the front of the inner rectangle. *Id.*

### *Barry Cammon*

Barry Cammon testified for the defense to the following: He is the proprietor of Advanced Video Solutions, a video productions company. He has been in this business for over twenty years. There are several ways to make enhancements of videos. One common way is to magnify the video. Another way is to adjust the lighting and another way is to slow down the video. Cammon stated that enhancements may not be as good as the human eye which naturally adjusts to various lighting conditions. He viewed Officer Ratcliff's video tape of the February 21, 2006, stop and testified that the lighting on the tag is completely distorted; there is far too much glare. He explained that the camera takes in light from everywhere and then attempts to adjust; therefore, the light on the tag was far too bright because the camera was attempting to adjust for the dark conditions outside. Furthermore, Officer Ratcliff's dash camera was focused on infinity so the tag is not in focus on the video and one cannot read the letters and numbers on the tag. He testified he viewed the video about ten times, and he could see no flapping. He was able to discern there was no flapping of the tag, even though the tag is not in focus on the video and there is a glare around the tag, because he could see distinct borders between the black car and the white tag. If the tag had been flapping, there would have been a differentiation in the amount of light seen as the tag flapped back and forth revealing the black car underneath the tag

6

and covering it back up again. Instead, he could see the hard lines between the dark vehicle and the light tag indicating there was no flapping.

*David D. Simpson*

The defendant, Simpson, testified to the following: He is from Cincinnati, Ohio where he purchased the 1999 Nissan Maxima. He had not had it thirty (30) days and Ohio allows thirty (30) days to obtain a regular tag. He had placed the duct tape on the bottom of the tag because the tag had no screws at the bottom and it was windy. He checked the tag in Dalton when he stopped the car for gas and found the tag was secure and the tape was still on. When Officer Ratcliff turned his blue lights on, the defendant signaled that he was moving over. He parked on the shoulder and Ratcliff asked for his drivers license and registration. Officer Ratcliff told him that he could not read the tag on his vehicle. On cross-examination, the defendant admitted the temporary tag was torn but stated when he stopped in Dalton to obtain gas, the tag was still flat. An employee of the Ohio License Bureau wrote in the February 22, 2006, expiration date on the tag.

## III. Analysis

The standard for reviewing the constitutionality of the traffic stop in the instant case is succinctly and accurately stated in *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2002):

> Police officers may briefly stop an individual for investigation if they have reasonable suspicion that the person has committed a crime. *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 813 (6th Cir.1999). An ordinary traffic stop is more "akin to an investigative detention rather than a custodial arrest." *United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999), *cert. denied,* 528 U.S. 1176, 120 S.Ct. 1207, 145 L.Ed.2d 1110 (2000). Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ⋯ of criminal activity." *Houston,* 174 F.3d at 813 (alterations in original) (internal quotations and citation omitted). It requires " 'specific and articulable facts

7

which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Moreover, reasonable suspicion "can arise from evidence that is less reliable than what might be required to show probable cause." *Id.*

The existence of reasonable suspicion must be viewed in the "totality of the circumstances." *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998) ( *en banc* ), *cert denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). This means that a court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith,* 263 F.3d 571, 588 (6th Cir.2001). Moreover, it is well-settled that the legality of a traffic stop is not dependent upon an officer's subjective intentions. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

In the instant case, Officer Ratcliff testified in the preliminary hearing and in the suppression hearing that the temporary tag on the defendant's vehicle was weathered and worn and that he could not read the expiration date. In the suppression hearing, Ratcliff further testified that the tag appeared to be "flapping" as the defendant drove down the highway at between 50 and 65 miles per hour. Officer Ratcliff explained that because the temporary tag was so worn and weathered, he was concerned that it might be out of date. Ratcliff stated he stopped the vehicle because he thought the tag had expired and because he thought the tag violated Tennessee law requiring it to be clearly visible.

The rectangle within a rectangle configuration of the tag which can be seen by the photographs admitted into evidence during the hearing on July 26, 2006, is significant because Barry Cammon, the defendant's video expert, testified his observations of the videotaped traffic stop led him to conclude the tag was not flapping. Mr. Cammon testified that although he could not read the license number in the video because the camera cast a severe white glare on the tag,

if the tag had been flapping, he would have seen a difference in exposure of light as the tag corner moved up and down exposing the black car and covering it back up again. However, on rebuttal, Ratcliff testified that the flapping which occurred was the smaller rectangle bearing the license number K780854 within the larger cardboard rectangle and that such flapping would not have caused a variation in exposure between black and white. When the inner rectangle flapped, the underlying outer rectangle, which was white, would have been exposed, not the black car. This observation makes sense to the undersigned, especially since there are visible tears along the top and upper sides of the inner rectangle suggesting that the top portion of the inner rectangle became separated from the larger, underlying white cardboard. This explanation also accounts for the buckling in the tag, visible at the top of the inner rectangle. (*See* Defendant's Ex. 14). Mr. Cammon's testimony did not address this portion of Officer Ratcliff's testimony, and I conclude that as the defendant's car moved down the highway, the upper portion of the inner rectangle on the temporary tag flapped back and forth.

Tenn. Code Ann. § 55-4-110(b), sometimes referred to as the "License Plate Law," provides:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12") from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and *in a condition to be clearly legible.* No tinted materials may be placed over a license plate even if the information upon such license plate is not concealed.

(Emphasis added). At least one court has found this statute applicable to out-of-state vehicles traveling the roadways in Tennessee, and I found no cases holding to the contrary. *See United States v. Walton*, 2004 WL 3460842 (M.D. Tenn. Nov. 12, 2004) (Obstruction of name of state

9

at bottom of plate caused by frame around plate gave officer a reasonable and articulable suspicion that Tenn. Code Ann. § 55-4-110(b) had been violated and traffic stop of Texas vehicle was reasonable.) Moreover, the statute uses inclusive language, *i.e.*, "[e]very registration plate," indicating intent to apply to all vehicles regardless of their origin of registration. Thus, the undersigned concludes Tenn. Code Ann. § 55-4-110(b) applies to the defendant's vehicle registered in Ohio.

The statute requires the plate to be "clearly legible." The expiration date is part of the plate, and I credit Officer Ratcliff's testimony that it was not legible. Nevertheless, were this the end of the story, the defendant might prevail if this Court adopted the Fourth Circuit's approach in *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000). In *Wilson*, a state trooper stopped a vehicle at night because he could not read the expiration date on the vehicle's temporary tag. In finding that the trooper lacked a reasonable, articulable suspicion that a violation had occurred sufficient to justify the traffic stop, the court reasoned:

> It was dark, and both cars were moving. Although Officer McLemore "could not see the written-in expiration date on the tag," that appears to have been a function of the darkness and the small space provided for writing in the date. There is no evidence that the temporary tag was illegible or in any way obliterated, smudged, or faded. *Cf. State v. Hudson,* 103 N.C.App. 708, 407 S.E.2d 583, 587 (1991) (faded numbers suggested that tag was more than thirty days old). There is no evidence that the tag lacked any required information, *United States v. Hill,* 131 F.3d 1056, 1060 (D.C.Cir.1997), that it was improperly displayed, *United States v. Dexter,* 165 F.3d 1120, 1124-25 (7th Cir.1999), or that it was concealed in any way, *United States v. McSwain,* 29 F.3d 558, 560 (10th Cir.1994). Wilson was pulled over solely because Officer McLemore could not read the handwritten expiration date "in the bottom little corner of the paper tag" as he drove behind Wilson after darkness had fallen. An objective assessment of the facts and circumstances of this stop compels the conclusion that the officer lacked any articulable, reasonable suspicion that a violation had occurred. Simply put, he saw nothing wrong, and he suspected nothing. Upholding a stop on these facts would permit the police to make a random, suspicionless stop of any car with a

> temporary tag. The Fourth Amendment does not afford the police such unbridled
> discretion. *See Prouse,* 440 U.S. at 663, 99 S.Ct. 1391.

Wilson, 205 F.3d at 723 -724. But Ratcliff's reason for stopping Simpson is not limited to his inability to read the expiration date in the dark. The tag looked weathered and worn and the bottom corners were duct-taped to the car. A vehicle traveling down the interstate at between 50 and 65 miles per hour would generate a significant amount of wind, and Ratcliff testified he saw part of the tag flapping. Based on the totality of the circumstances, I conclude Ratcliff had a reasonable and articulable suspicion to believe that the temporary tag was so old it had expired (in fact, it was valid for only one more day).

The defendant also argues that *United States v. Granado*, 302 F.3d 1421 (5th Cir. 2000) is on point and directs the undersigned to find the traffic stop in this case illegal. In *Granado*, a state trooper detained a vehicle traveling in Texas because a license plate frame covered the name of the state which issued the plate. This fact was significant because Texas vehicles were required to have front license plates as well as rear license plates, and this vehicle had only a rear plate. After the stop and as the trooper approached the car, he saw the plate was issued in Coahuila, a state in Mexico. He continued to the car where he asked the driver for his license and "[t]his began a lengthy stop that included extensive questioning, a frisking, and a search of the van." *Id.* at 423.

The *Granado* court concluded the trooper lacked a justiciable basis to continue to detain the defendant under the front license plate law after he determined the plate was not issued in Texas. *Id.* In addition, the court concluded the license plate frame which covered the name of the issuing state violated no Texas law. Texas law in effect at that time made it an offense to

11

obscure information on the plate by "blurring matter;" "a sticker, decal or other insignia not authorized by law;" or a coating, covering or protective material."[3] Strictly construing the Texas statute, the court held the plate frame fell under none of these three categories and thus did not violate Texas law. *Id.* at 424.

In contrast to the Texas statute then in effect, the language of Tenn. Code Ann. § 55-4-110(b) is far broader requiring display of the plate "in a condition to be clearly legible." In addition, Ratcliff had reasonable suspicion to believe the temporary tag was no longer valid. While Ratcliff was able to read the expiration date after he exited his vehicle but before he approached the passenger side of the Nissan, I find it was not unreasonable under Fourth Amendment standards for Ratcliff to approach the vehicle to explain why he had stopped it in the first place. This action took only seconds and constituted part of the original traffic stop. However, immediately upon reaching the passenger side window, additional information developed which merited further detention, *i.e.* the odor of marijuana. At that point, at the very least, reasonable suspicion existed to detain the defendant long enough to run the drug dog around the car. *See United States v. Bailey,* 302 F.3d 652, 657-58 (6th Cir. 2002) (officers may continue to detain for investigatory purposes after the original purpose of the traffic stop is completed only if something occurred during the traffic stop to generate the necessary reasonable suspicion to justify further detention); *United States v. Hill,* 195 F.3d 258, 263 (6th Cir.) (same), *cert. denied*, 528 U.S. 1176 (2000); *United States v. Mesa*, 62 F.3d 159, 162 (6th

---

[3] This statute has since been revised to contain broader language which would include license plate frames as prohibited coverings on plates if the frames obscured information on the plates. *See United States v. Contreras-Trevino*, 448 F.3d 821, 824 (5th Cir. 2006), *petition for cert. filed,* (Sept. 7, 2006)(No. 06-6373).

Cir. 1995) (same); *see also United States of America v. Atkins*, 1999 WL 1045942 **2 (6th Cir. Nov. 8, 1999) (strong smell of marijuana coming from car after valid stop for speeding gave officers probable cause to search vehicle for marijuana). Once the drug dog alerted on the car, probable cause existed to search it. *United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999) ("A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance"); *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) (same).

Finally, the defendant argues the government has produced no evidence that the validity of the defendant's temporary tag could not have been checked though the National Crime Information Center (NCIC). Implicit in this argument is the further argument that Officer Ratcliff was not justified in stopping the defendant to see if the tag had expired because Ratcliff could have run an NCIC check on the tag. Officer Ratcliff testified he patrols the highway and routinely makes traffic stops. He further testified that NCIC checks cannot be run on temporary tags. The defendant has produced no evidence to the contrary. The defendant points to a case, *United States v. Johnson*, 14 F.3d 597 (4th Cir. 1994), in which police did successfully run an NCIC check on a temporary *dealer* tag. However, the defendant has produced no evidence as to whether temporary dealer tags are registered in the same manner as other temporary tags. On the other hand, Officer Ratcliff is certainly qualified to testify as to his experience concerning temporary tags and NCIC checks, and I credit his testimony.

## IV. Conclusion

Considering all the evidence presented in this case as a whole and based on the totality of the circumstances, I conclude reasonable suspicion existed to believe the defendant's temporary tag had expired and was in violation of the Tennessee License Plate Law, Tenn. Code Ann. § 55-4-110(b). Accordingly, it is RECOMMENDED that defendant's motion to suppress evidence be DENIED.[4]

                            s/William B. Mitchell Carter
                            UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).